IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| KEHINDA MITCHELL, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| CITY OF CHICAGO, Chicago Police | ) | |
| Detectives MICHAEL MCDERMOTT, | ) | |
| ANDY JONES, K. GLYNN, and JACK | ) | |
| WILKINS, Youth Officer NAPOLEON | ) | |
| STEVENSON, and Officer K. GROSS, | ) | |
| Cook County Assistant State's | ) | JURY TRIAL DEMANDED |
| Attorney SHARON JEFFERSON, COOK | ) | |
| COUNTY, ILLINOIS, and Unknown | ) | |
| Current or Former Employees of | ) | |
| the City Of Chicago, | | |
| | | |
| Defendants. | | |

**COMPLAINT**

NOW COMES Plaintiff, KEHINDA MITCHELL, by and through his

attorneys, LOEVY & LOEVY, and complaining of Defendants Chicago

Police Detectives MICHAEL MCDERMOTT and JACK WILKINS and Youth

Officer NAPOLEON STEVENSON, Cook County Assistant State's

Attorney SHARON JEFFERSON, THE CITY OF CHICAGO; THE CITY OF

CHICAGO (hereinafter "City"), COOK COUNTY, ILLINOIS (hereinafter

"COOK COUNTY"), and Unknown Current or Employees of the City Of

Chicago, alleges as follows:

## Introduction

1.    Plaintiff, Kehinda Mitchell, was convicted of a murder and aggravated battery that he did not commit. Arrested at 15 years old, Plaintiff was sentenced to thirty years in prison.

2.    The crimes for which Plaintiff was wrongfully convicted happened in 1992, when two shooters opened fire on the corner of a street on the south side of Chicago in an apparent gang-related altercation. There was no physical evidence linking Plaintiff to the crimes and no eyewitnesses that placed him at the scene. The only eyewitness to the shooting—an older man who worked at the nearby corner store and whose brother-in-law was hit by a stray bullet—informed the investigating officers at the time that he could identify the shooters and provided descriptions of each of them. He has stated emphatically that Plaintiff was not one of the shooters.

3.    Plaintiff's conviction rested almost exclusively on a fabricated oral confession manufactured by Defendants.

4.    At the time of his arrest, Plaintiff was a 15-year-old kid. He was a student and spent much of his time playing video games with friends. He was not in a gang. He had never been convicted of any crime. He had no involvement in the dispute that led to this killing.

5.    Despite all of that, at Area 2 Police Headquarters, Defendants isolated him from his mother and attorney, physically

and verbally threatened him in an attempt to get him to confess. When he refused, Defendants fabricated that Plaintiff voluntarily confessed to murder. Plaintiff denies that he ever confessed and protested his innocence from day one.

6.    As Plaintiff learned over time, he was not the first— nor the last person—that would be the victim of Defendants' coercion and fabrication. To the contrary, a 2006 Special Prosecutors Report found a longstanding pattern of abuse at Area 2, where Defendants McDermott and Wilkins were assigned. In fact, the Special Prosecutor concluded that Defendant McDermott's conduct at Area 2 was criminal and that he should have been prosecuted for his mistreatment of criminal suspects.

7.    In 2010, Defendant McDermott confessed during federal testimony (for which he was given immunity) that he had lied about his police misconduct in other cases both to internal investigators and at motions to suppress and that he had witnessed the use of coercive interrogation tactics at Area 2, like pointing a gun at a suspect and threatening them, which Plaintiff alleges happened in his case.

8.    Never giving up on proving his innocence, Plaintiff obtained counsel and worked tirelessly to show that he had absolutely nothing to do with this crime. Several witnesses recanted their testimony or statements that implicated

Plaintiff. Several community leaders came forward to support Plaintiff.

9.    Based on Plaintiff's tireless pursuit of justice and Defendant McDermott's explosive testimony, on November 6, 2017, the State took the extraordinary step of agreeing to vacate Plaintiff's conviction. After over twenty years, and over a decade of post-conviction litigation, Plaintiff was finally cleared of the murder and aggravated battery charges. This lawsuit seeks redress for his injuries.

### Jurisdiction

10.   This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

11.   This Court has jurisdiction for Plaintiff's constitutional claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction his state law claims pursuant to 28 U.S.C. §1367. Venue is proper under 28 U.S.C. § 1391(v). The events giving rise to this complaint occurred in this judicial district.

### The Parties

12.   Kehinda Mitchell is a 42-year-old father of three. During his wrongful incarceration, Mr. Mitchell earned his GED and worked inmate jobs as a barber and custodian.

13.  At all times relevant hereto, Defendants Detective
Michael McDermott, Detective Jack Wilkins, Detective Andy Jones,
Detective K. Glynn, Officer K. Gross, and Youth Officer Napoleon
Stevenson, and other unidentified employees of the Chicago
Police Department ("Defendant Officers") were police officers or
otherwise employed by the Chicago Police Department. All are
sued in their individual capacities, and acted under color of
law and within the scope of their employment during the
investigation of the murder at issue.

14.  At all times relevant, Defendant Sharon Jefferson was
an Assistant State's Attorney in the Felony Review unit of the
Cook County State's Attorney's Office (hereinafter CCSAO), and
employed by the Cook County State's Attorney's Office.  She is
sued in her individual capacity, and acted under color of law
and within the scope of her employment during the investigation
of the murder at issue.

15.  Defendant City of Chicago is an Illinois municipal
corporation. The City of Chicago is or was the employer of each
of the Defendant Officers.

16.  Defendant Cook County is a governmental entity within
the State of Illinois, which consists in part of its Cook County
State's Attorney's Office, and was at all relevant times the
employer of Defendant Sharon Jefferson. Defendant Cook County is
a necessary party to this lawsuit.

5

### The Crime

17.   On or about July 21, 1992, Howard Shell and another man robbed Debra Bates at gunpoint in her home.

18.   The next day, on the afternoon of July 22, 1992, two people shot into a crowd at the intersection of 79th and Ellis. Shell was killed and two other individuals were injured.

19.   Police responded to the scene and did an initial canvas. In speaking to various witnesses in the neighborhood, police learned that there were at least two offenders, both of whom were male and black around the ages of 18 to 24.

20.   Police also learned that there was an eyewitness, an older man named Joseph Tribett. Tribett's brother-in-law had been hit by a stray bullet. Tribett worked at the corner store near where the shooting occurred.

21.   Tribett said he got a good look at the shooters. He told them that he could remember the faces and positively identify the shooters. He gave the police his address but nonetheless was never contacted by the Defendants.

### Plaintiff's Absolute Innocence

22.   At the time of the murder, Plaintiff was only 15 years old.

23.   Plaintiff was not present at the scene of the crime and knew absolutely nothing about it. To the contrary, at the

time, Mitchell was on his way to trade a video game with his friend when he heard that a shooting occurred and ran home.

**The Investigation and Defendants' Coercion of Witnesses**

24.  Defendants initially focused their investigation on Jermaine Bates, who was a member of the Vice Lords and Debra Bates' son. They believed the shooting may have been retaliation by the Vice Lords for the robbery the day before of Bates's mother.

25.  About a week after the shooting, Defendants questioned Bates at Area 2 police headquarters about the shooting. Defendant McDermott hit Bates hard and threatened to charge him with murder. Bates made up a story naming Tyce Dove and Mitchell as the shooters and Lanell Townsend as driving the getaway car. Defendants never disclosed to the prosecutor the fact that they coerced and fabricated a statement for Bates to sign.

26.  Rather than conduct a proper investigation, the Defendants short-circuited the process, taking the fabricated leads from Bates, and never looked back.

27.  On August 1, 1992, the police arrested Dove and Townsend. Dove was brought into Area 2 at 10:00 a.m. on August 1. He was held at the station overnight, until he agreed to give a confession at around 5:30 a.m. According to Dove, then only 19 years-old, Defendants McDermott and Wilkins choked and grabbed him, threatened him, and refused him food and drink until he

7

agreed to sign a confession that they had fabricated and fed to him. That confession implicated Mitchell, Dove and Townsend in the murder.

28.  The police also arrested Townsend. Townsend initially told Defendant McDermott that he did not have anything to do with the shooting. McDermott, however, told Townsend that he needed more than Bates' statement to charge Dove and Mitchell with the murder and fed Townsend with details of the crime that he wanted Townsend to adopt as his own.

29.  When Townsend refused to sign these fabrications, McDermott became angry: He smacked Townsend on the face, choked him and banged his head against the wall. McDermott turned to his partner and called Townsend a "young, dumb nigger."

30.  Because Townsend refused to adopt McDermott's fabricated confession, Defendant McDermott simply made up an oral confession implicating Townsend in the crime and attributed it to Townsend in the police reports. Defendants suppressed the fact that they coerced Townsend, and withheld the fact that they fabricated his statement as well.

## The Interrogation

31.  After learning that he too was wanted by the police, Plaintiff and his mother, Audrey Mitchell, voluntarily went to Area 2 in the very early morning of August 2, 1992. At the time,

Mitchell was only fifteen years old: he was about 5 feet 6 inches and 160 pounds.

32.   Plaintiff was unsophisticated about the criminal justice process. Once Plaintiff and his mother arrived at Area 2, the two were taken to an interrogation room.

33.   Plaintiff's mom told him that she was going to try to contact a lawyer; she instructed her son not to say anything while she was gone; and then left the interrogation room.

34.   Alone with the detectives, Plaintiff was continually probed about the crime. The detectives were making comments such as "you might as well go and tell, you will get probation," or words to that effect. Plaintiff told McDermott and Wilkins that he did not know anything about the case.

35.   When Ms. Mitchell returned to the interrogation room, Ms. Mitchell told the detectives that she did not want them speaking to her son because there was a lawyer on the way. She left again to return a page.

36.   Against Ms. Mitchell's clear instructions, the detectives continued to interrogate Plaintiff. They started threatened him, telling him "he ain't going nowhere" and that he was going to tell them what happened whether he liked it or not, or words to that effect. They also told him they would "charge him with Murder 2," or words to that effect. McDermott and Wilkins made threatening gestures included but not limited to

9

popping their knuckles, making fists at him and then pulling out their guns to intimidate him.

37. Meanwhile, after she spoke to a lawyer, Ms. Mitchell tried to return to the interrogation room. As she was walking up the stairs to do so, Defendants told her that she was no longer needed. When she protested, Defendants told her that she would be arrested if she came back again.

38. Ms. Mitchell called then-attorney-now-Judge Fredreena Lyle. Judge Lyle then called Area 2, and personally advised Defendants that she was coming to the police station and instructed them not to speak with her client, Plaintiff, any further.

39. But the Defendants did not honor Judge Lyle's order. To the contrary, they continued to threaten and intimidate Plaintiff, yelling at him to confess.

40. Plaintiff continued to protest his innocence. Frustrated by this, Defendants fabricated out of whole cloth that Plaintiff spontaneously confessed to them. According to the Defendants, 15 year-old Plaintiff (who had never had been to a police station before) flagged down Defendant McDermott and told him that he wanted to tell the whole truth but not in front of his mother. Then Plaintiff confessed to committing the shooting. This confession was wholly false and fabricated by Defendants McDermott and Wilkins.

41. Though Mr. Mitchell could not have known this at the time, this was longstanding practice for these two Area 2 detectives.

42. A short time later, Defendant Assistant State's Attorney Sharon Jefferson entered the interrogation room, accompanied by Defendant Wilkins. Defendant ASA Jefferson then interrogated Mitchell.

43. Sometime after Plaintiff had been interrogated multiple times by the Defendants, they brought in Defendant Youth Officer Napoleon Stevenson. Defendant Stevenson never actually spoke to Plaintiff, and he did nothing to prevent his false confession, or to protect Plaintiff's interests and rights during the interrogations.

44. To the contrary, Defendants Jefferson and Stevenson then also fabricated that Plaintiff confessed to them. This was a lie; Plaintiff never confessed to anyone.

45. During this time, Plaintiff had no contact with either his mother or his attorney. Worse yet, even after he spoke to his attorney, Judge Lyle, and Judge Lyle instructed the Defendants to cease all questioning of her client, the Defendants continued to try to interrogate Mr. Mitchell.

46. In the early morning hours of August 2, Plaintiff was charged for murder and aggravated battery.

**First Trial Results in a Hung Jury**

11

47.  At Plaintiff's first trial, he was jointly tried with Townsend: Plaintiff by a jury, Townsend by a bench trial.

48.  At trial, the shooting victims testified for the State: none of them testified that Plaintiff had anything to do with the shooting. Instead, the State's case rested almost entirely on the alleged oral confession fabricated by Defendants.

49.  After closing arguments, the Judge sustained a directed verdict in favor of Townsend. Inexplicably, even though McDermott alleged that Townsend orally confessed to him, the prosecutor never sought to introduce that extremely inculpatory evidence at trial. Without the alleged oral confession, there was absolutely no evidence implicating Townsend in the shooting.

50.  For Plaintiff, however, the jury simply could not reach a verdict. With the jury hopelessly deadlocked, the court declared a mistrial. When the jury was polled, they were 10-2 in favor of acquittal.

**Defendant Officers Coerce a Witness into Implicating Plaintiff**

51.  The State elected to retry Plaintiff, this time in a double trial along with codefendant Dove.

52.  On the eve of the Plaintiff's second trial, there was little, if anything, to connect Plaintiff to the shooting.

Fearing their case had fallen apart, Defendants went out and found their eleventh hour witness: Gene Keller. Keller told the Defendants that he knew nothing about the murder, and certainly nothing about Plaintiff's involvement in it.

53.  Undeterred, however, the Defendants coerced Keller into falsely implicating Plaintiff in the crime, including by threatening to charge him with murder. According to the statement fabricated by Defendants, Keller alleged that Plaintiff was a member of the Vice Lords, giving him a motive to commit the crime.

54.  Defendants suppressed or destroyed any evidence that they had coerced Keller into implicating Plaintiff.

55.  Apart from the new evidence from Keller, the other evidence presented at Plaintiff's second trial largely parroted that at his first.

### Plaintiff's Wrongful Conviction

56.  On September 14, 1995, based on the Defendants' fabricated evidence and the unlawfully coerced testimony of witnesses, including but not limited to that of Gene Keller, Plaintiff was wrongfully convicted of murder and two counts of aggravated battery.

57.  Without the Defendants' misconduct, Plaintiff never would have been arrested, let alone convicted.

13

58.   During his sentencing, Plaintiff maintained his innocence. As he wrote to the Judge:

> "From the very first day I entered your courtroom my plea to you was not guilty—-my plea stands the same.
> …
> I know that I'm absolutely, positively, certain that I had no complicity.
> …
> I am not in any way violent or rebellious to the law. I have never committed any crime at all in my entire life. I have never been written-up for a single curfew violation. I'm rather one humble young man who desires to one day join a fraternity in college and basically be somebody."

59.   Plaintiff was sentenced to 30 years in prison. His conviction and sentence were affirmed on direct appeal.

### Numerous Witnesses Come Forward to Recant their Testimony and Protest Plaintiff's Innocence

60.   After he was wrongfully convicted, Plaintiff never gave up on his innocence. He was been involved in post-conviction litigation for two decades, beginning in 1999 with a *pro se* post-conviction petition and subsequent petitions and appeals.

61.   Numerous community leaders came forward to support Plaintiff in his pursuit of justice, and witnesses, including Bates, Dove, Townsend and Keller, recanted their statements explaining that they were coerced and fabricated by the Defendants.

### Special Prosecutor's Report Reveals Widespread Misconduct at Area 2 and Defendants McDermott's and Wilkins' Involvement

14

62.   In addition, Plaintiff began amassing information that he was not alone in being a victim of the Defendants' misconduct.

63.   Beginning in the late 1990s, United States District Judge Ruben Castillo ordered the public release of the Goldston and Sanders reports revealing widespread police torture at Area 2 headquarters.

64.   As public pressure mounted, in April 2002, Chief Criminal Judge Paul P. Biebel appointed two special prosecutors to investigate claims of torture at Area 2. After a four-year investigation, which cost $7 million, on July 9, 2006, Special Prosecutors Edward J. Egan and Robert D. Boyle issued the "Report of the Special State's Attorney" (hereinafter the "Special Prosecutor's Report"), finding that torture occurred under Jon Burge at Area 2.

65.   More specifically, the Special Prosecutor determined that sufficient evidence existed to prove that Defendant McDermott tortured a criminal suspect at Area 2. In addition, the Report also includes allegations of misconduct against Defendant McDermott's partner, Defendant Wilkins.

66.   In 2010, Defendant McDermott confessed during federal testimony (for which he was given immunity) that he had lied about his police misconduct in other cases both to internal investigators and at motions to suppress; that he had witnessed

15

the use of coercive interrogation tactics, like pointing a gun at a suspect and threatening them, which Plaintiff alleges was used in his case; but McDermott reasoned that his use of coercion and fabrication were appropriate because he did not want a defendant getting away with murder.

67. At the time McDermott gave this testimony, he was working for the CCSAO. The CCSAO conducted their own internal investigation, which likewise concluded that McDermott had used psychologically or physically coercive tactics to elicit false statements from both suspects and witnesses alike and then perjured himself by lying about his misconduct on the stand.

### Plaintiff's Exoneration

67. In 2017, Plaintiff was finally exonerated. After Defendant McDermott's explosive testimony confessing his pattern of criminal misconduct, on November 6, 2017, the State took the extraordinary step of agreeing to vacate Plaintiff's conviction.

### Defendants' Pattern and Practice of Coercing False Statements in order to Secure Wrongful Convictions

68. The constitutional violations that caused Plaintiff's wrongful conviction were not isolated events. To the contrary, they were the result of the City of Chicago's policies and practices of pursuing wrongful convictions through reliance on coerced statements and profoundly flawed investigations.

16

69. Defendants' fabrication of Plaintiff's oral confession and coercion of false statements from each of the witnesses in this case was undertaken pursuant to, and proximately caused by, a policy and practice on the part of the Department.

70. There are numerous examples of abuses perpetrated by the Defendants in addition to Plaintiff, Dove, Townsend and Bates. Those include but are not limited to:

a. Alfonso Pinex alleged that in June 1985, Detectives McDermott and Anthony Maslanka physically abused and psychologically coerced him, including telling Pinex that they were going to "tear his ass up." The detectives also refused to allow Pinex to speak with his attorney until he confessed to a murder that he did not commit. McDermott and Maslanka testified at Pinex's motion to suppress that they did not abuse or mistreat Pinex in any way. The trial court did not believe the detectives, and suppressed Pinex's confession because of the detectives' gross misconduct; the prosecution, with nothing else on which to base the murder charge, ultimately dropped the case against Pinex. As part of its investigation into Area 2 police abuse, the Special Prosecutor confirmed the trial court's findings: McDermott and Maslanka willfully and falsely testified at Pinex's motion to suppress that Pinex was not mistreated.

b. In January 1993, fifteen year-old Joseph Carroll was taken to Area 2 by Detectives McDermott and Boylan. Carroll alleged that McDermott pushed his head into a radiator and threatened him in an effort to get him to confess to a crime that he did not commit. In addition, much like Plaintiff, Carroll, a minor, alleged that he was not allowed to contact his parents. Indeed, Carroll's grandfather, Henry Smallwood, with whom Carroll lived, testified that he went to the police station after he learned that "there were some kids taken to the 5th District" following a nearby shooting. Smallwood was told that his grandchild was upstairs speaking to detectives, but was told that he could not see him.

17

c. Cersenia Blackburn alleged that in November 1991, Detectives McDermott, Baker and Boylan came to her home and asked if her 21 year-old son, Anthony Holman, was home. Blackburn told the detectives that they could not enter her house without a search warrant. Approximately 15 minutes later, the same detectives kicked in her front door. The officers pointed a gun to her head, struck her in the head, and kicked her in the legs and vagina. In addition, Blackburn alleged that the detectives verbally abused her, saying "black bitch, I'll kill you," and "I'm going to fuck up this house." Blackburn reported her medical injuries that very day and the doctors noted abrasions on her body consistent with her reported injuries.

d. After barging into Blackburn's house, Detectives McDermott, Baker and Boylan located 21 year-old Anthony Holman who was upstairs. Holman alleged that the detectives struck him in the head with a flashlight, stepped on his hands and hit him about his body. Holman stated that when he arrived at the police station, he was slammed into wall, struck in the face with a briefcase and punched in the eye. In addition, McDermott, Baker and Boylan verbally harassed him, stating, "We got your little Black Ass, You Nigger." Holman was treated at Roseland Hospital for injuries to his head, right eye and back.

e. Franklin Burchette alleged that in May 1984, Detectives McDermott, DiGiacomo and Solecki, physically threatened him and psychologically coerced him into falsely confessing. The detectives threatened to use an electric prodder on Burchette and told Burchette that they would "get information out of [him] before the night's over." In addition, the detectives refused to permit Burchette to see his mother, despite her being at the police station and looking for him that evening. As a result, Burchette eventually falsely confessed.

f. Andrew Maxwell, Gregory Howard and Jerry Thompson were all incarcerated on armed robberies when they were writted out of jail in November 1986 and questioned about an unrelated murder. Howard, Maxwell and Thompson, each only then 19 years-old, alleged

that they were physically abused and psychologically coerced by McDermott and other detectives.

g. Specifically, Maxwell alleged that he was interrogated by three officers. Although Maxwell could only remember Officer Glynn's name, McDermott testified that he, Detective Glynn and Detective Paladino spoke with Maxwell. When Maxwell told the officers that he did not know anything about the murder, the officers handcuffed his arms to a pole, pulled his coat over his head and started hitting him about his body. As the detectives were leaving the interrogation room, they told Maxwell, "By the time we come back, you [sic] going to say something." The officers later told Maxwell that they could just keep him at the station for 72 hours without charging him with anything. Under the weight of this pressure, Maxwell confessed.

h. Maxwell's co-defendants, Jerry Thompson and Gregory Howard also alleged that they were abused by Area 2 detectives. Thompson alleged that he was not allowed to make a phone call until after he had given a statement; Howard alleged he was not allowed to speak to an attorney until after he gave a statement. Howard was handed a statement and told to parrot it; similarly, Thompson was handed a fake confession and told to memorize and repeat it. Both state that they falsely confessed because of the physical and verbal abuse of the detectives at Area 2.

i. Daniel Vaughn alleged that in August 1987 he was arrested at his house by Detectives Yucaitis and McDermott for murder. While Vaughn was handcuffed in an interrogation room, Yucaitis played the "bad cop" and McDermott played the "good cop." Yucaitis threatened to "beat" and "break every bone" in Vaughn's body if he did not confess; a third detective that was present punched Vaughn in the face. Vaughn consistently asked for counsel but was denied the same by Yucaitis and McDermott. Vaughn ultimately falsely confessed to a crime he did not commit.

j. Virgil Bass alleged that he was taken to the police station in May 1988 for questioning regarding a homicide. At the time, Bass had a very recent gunshot wound to his foot. Bass alleged that he was taken to

an interrogation room and handcuffed to a ring on the wall. Although he repeatedly told Detectives Wilkins and McGovern that he was in pain, they refused him medication. Indeed, according to Bass, Wilkins and McGovern told him that he was not allowed to leave the room until he told them "what they wanted to hear." Bass then gave a false statement implicating himself in the murder. The trial court granted Bass's motion to suppress and admonished the detectives for their treatment of him.

k. Additionally, on appeal, the court expressly found Wilkins' testimony at the motion to suppress to be unbelievable. The appellate court stated that it was "absurd to think that defendant, who had only hours before sustained a gunshot injury to his leg and was obviously in pain, would voluntarily remain at the police station for 12 hours in order to speak with police."

l. David Randle alleged that in January 1991, he was taken to the police station regarding the murder of Sophia Lorek. Randle had Dilantin with him that he took regularly to control his seizures. At the police station, he was interrogated by Detectives Wilkins, Boylan, McDermott and Basile. According to Randle, the detectives threatened him, telling him that he was going to talk regardless, and physically abused him, by stepping on and crushing his Dilantin and squeezing his testicles. Not able to withstand such abuse, Randle gave a statement. After he did so, he was taken to Roseland Hospital to receive treatment for his seizure disorder.

m. Christopher Askew alleged that in October 1990, at the age of 19, he was abused by Detectives McDermott and Boylan during his interrogation. Askew alleged that Detective McDermott became "hysterical" when Askew told McDermott he knew nothing about the murder and struck Askew. Askew further alleged that McDermott denied him an attorney, a phone call and food and water.

q. Shadeed Mumin alleged that he was taken to Area 2 in October 1985 for questioning on a murder. At Area 2, Mumin alleged that he was beaten about his body and suffocated with a typewriter cover by Lieutenant Jon

Burge and other Area 2 Detectives, including
McDermott. The detectives coerced him, with comments
such as "you'll talk before you leave here," and
"you'd better fucking talk." Scared for his life,
Mumin confessed. Mumin gave testimony before the
police board regarding Burge's torture and Burge was
later fired from the police force. Mumin also gave
sworn testimony about this abuse at Burge's federal
obstruction of justice and perjury trial.

r.    Anthony Daniels alleged that in 1988 he was
interrogated by Detectives McDermott, Boylan and
Cummings regarding the murder of Ray McCoy. According
to Daniels, McDermott, Boylan and Cummings all
physically abused him, including hitting him in the
chest and face. Daniels also alleged that he was
psychologically coerced.

s.    Anthony Daniels' sister, Sheila Daniels, alleged
that in November 1988, police officers arrived at her
house and took her to the police station to question
her about the McCoy murder. Ms. Daniels testified that
she was not allowed to use the phone despite numerous
requests to call her sister and her attorney; instead,
the officers simply continued to question her. In
addition, she was taken to see her brother, Anthony
Daniels, and Tyrone Daniels, both of whom were
severely beaten. Eventually, under the weight of the
stress, Ms. Daniels gave a statement.

t.    Tremmel Broadwater, then a minor, alleged that in
April 1989, he was coerced into signing a false
statement indicating that he was a witness —to a
murder. Broadwater alleged that the police composed
the fabricated written statement for him to sign. He
only agreed to sign the statement because of threats
made by Detectives McDermott, Glynn and Costello to
arrest Broadwater for the murder or for possession of
a sawed off shotgun if he did not do so. To ensure his
grand jury testimony on the matter, Broadwater was
kept at the police station against his will from
Friday afternoon until Monday morning, when he
testified although he was, by all accounts, only a
witness and not a suspect.

u.    Tony Anderson alleged that in August 1991 he was
physically abused and threatened by Detectives

McDermott, Maslanka, Gallagher and Paladino. For example, Anderson alleged that Detective McDermott placed a gun to his head and threatened that he would "blow [his] damn brains out" if he did not confess. Anderson also alleged that McDermott would not allow him to make a phone call to contact his family or an attorney. Under the weight of this abuse, Anderson ultimately falsely confessed. Mr. Anderson was granted a hearing by the Illinois Torture and Relief Commission on his allegations of torture, concluding that Mr. Anderson's claim "is credible and merits judicial review."

71. The wrongful convictions of innocent persons involving fabricated and coerced false statements include numerous cases in which Department detectives used the very same tactics that the Defendants employed against Plaintiff, his co-defendant and the witnesses in this case. These tactics include: (a) physical abuse; (b) psychological intimidation and manipulation; (c) fabrication of confessions; (e) concealment of exculpatory information; (f) false promises of leniency in exchange for "cooperation" in the form of a statement; and (g) use of other unlawful tactics to secure the arrest, prosecution, and conviction of persons without regard to their actual guilt.

72. Juveniles and young adults, in particular, including Plaintiff, were the most vulnerable targets of this municipal policy. Law enforcement officers are trained to know that youth are inherently more suggestible, susceptible to manipulation, and frequently lack the ability to fully understand – let alone assert – their rights during an interrogation. As a matter of

widespread custom and practice, CPD officers, including but not limited to the Defendant Officers, exploited the vulnerability and suggestibility of the youth in their custody in order to obtain false confessions and close open cases. CPD detectives systematically denied juvenile and teenage suspects access to their guardians and to counsel, fed them details of the crime, made false promises of leniency, and generally subjected these youth to immense physical and psychological pressure. This practice is aided, perpetuated, and enhanced by the Chicago Police Department's policy and practice of using so-called "youth officers" to assist in coercion of juveniles during interrogations as set forth more fully in this Complaint.

73. Consistent with the municipal policy and practice described in the preceding paragraph, members of the Department, including but not limited to the Defendant Officers, systematically suppressed evidence pertaining to these fabricated and coerced statements, both from the Cook County State's Attorney's Office and from criminal defendants.

74. As a matter of both policy and practice, municipal policy makers and Department supervisors condoned and facilitated a code of silence within the Chicago Police Department. In accordance with this code, Department detectives refused to report and otherwise lied about misconduct committed

by their colleagues, including the misconduct at issue in this
case.

75.   The policy and practice of the City of Chicago is so
well-established that it has important ramifications for
misconduct in the Felony Review Unit ("FRU") of the Cook County
State's Attorney's Office, which includes young and/or new
attorneys who, rather than work in courtrooms, are part of the
investigation in Department Detective Divisions and work
alongside police officers. As a consequence, the misconduct and
coordination between the Defendant Officers and ASA Defendant
during the investigation of the shooting at issue in this case
was not unique or isolated. Instead, members of the FRU as a
matter of widespread custom and practice, routinely facilitate
and cooperate in fabricating and coercing confessions from
suspects in the custody of the Chicago Police Department and
then fail to disclose exculpatory evidence to attorneys in their
own Trial Division.

76.   The manner in which the CCSAO staffs the Felony Review
Unit also reinforces systemic and symbiotic misconduct for years
to come. In particular, the CCSAO typically staffs the FRU with
new, young prosecutors. Those prosecutors are quickly taught
that they have to be "team players" and go along with the
actions of the CPD Detectives, even if their actions involve
misconduct. The FRU attorneys know that their time in the unit

24

has the potential to "make or break" their careers, giving them an incentive to go along with the Detectives, because performance in the FRU was a stepping stone to getting to the Trial Division of the SAO.

77.    The FRU attorneys are also taught that, through pressure from Department officers and their own supervisors, that they had to approve Detectives' charges even if they did not believe there was enough evidence, because standing in the way could be an impediment to getting into the Trial Division and because they would be punished by their supervisors for resisting not being "team players." Then, by the time young prosecutors get into the Trial Division, who need to secure convictions to get promoted, prosecutors have little opportunity or incentive to expose police misconduct, even when they see it, because doing so will make police officers unwilling to serve as witnesses in their cases because they are not "team players."

78.    As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department. In accordance with this code, Chicago Police Detectives refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case. The Code of Silence is so pervasive that, as in

25

this case, it often involves other law enforcement officers and agencies, like the Felony Review Unit.

79.  As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct; failing to investigate cases in which the police are implicated in obtaining coerced and false statements, as well as wrongful charges and convictions; failing to discipline officers accused of this unlawful conduct; and facilitating a code of silence within the Department, Chicago police officers (including the Defendant Officers here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences.

80.  The City's failure to train, supervise, and discipline its officers effectively condones, ratifies, and sanctions the kind of misconduct that the Defendant Officers committed against Plaintiff in this case.  Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and de facto policies, as alleged above.

81.  The City of Chicago and officials within the Department failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of

26

misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

82. The policies and practices described in the foregoing paragraphs were consciously approved by City of Chicago policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

### Plaintiff's Damages

83. Plaintiff was sentenced to thirty years in prison for crimes that he did not commit. He served 15 years in prison during the most formative years of his life: from age 15 to age 30.

84. The emotional pain and suffering caused by losing these formative years has been substantial. Plaintiff was taken from his family when he was just a teenager. During his incarceration, he was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to graduate from high school with his friends, to share holidays, births, funerals, and other life events with loved ones, the opportunity to have girlfriends, to fall in love, to marry, and to pursue a career, and the fundamental freedom to live one's life as an autonomous human being. Several relatives died while he was incarcerated, including, most painfully, his

27

oldest brother. Plaintiff was denied the opportunity to attend their funerals, and continues to struggle to find a means to grieve.

85.   Plaintiff's whole life was turned upside down without any warning. His childhood and young adulthood was consumed by the horror of his wrongful imprisonment. During his long wrongful imprisonment, Plaintiff was detained in harsh and dangerous conditions in prisons. He suffered extreme physical and emotional harm from witnessing violence against other young inmates including beatings, shootings, and even death.

86.   Indeed, at one point, not believing he could stand it anymore, Plaintiff tried to take his life. Thankfully he was not successful, but the attempt itself underscores the absolute despair he experienced growing up wrongfully convicted inside the prison walls.

87.   As a result of the foregoing, Plaintiff has suffered tremendous damage, including but not limited to physical harm, mental suffering, and loss of a normal life, all proximately caused by Defendants' misconduct.

### COUNT I – 42 U.S.C. § 1983
### Violation of Due Process

88.   Each paragraph of this Complaint is incorporated as if restated fully herein.

89. As described more fully above, all of the Defendants, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

90. In the manner described more fully above, the Defendant Officers, individually, jointly, and/or in concert and in conspiracy, fabricated false reports and other evidence, deliberately withheld material exculpatory and impeachment evidence, and destroyed and/or intentionally lost material evidence. In doing so, the Defendants violated their clearly established duties to report all material exculpatory and impeachment information to prosecutors and to preserve material evidence.

91. The destruction or loss of evidence was done in bad faith, and/or was done so that Plaintiff could not present material exculpatory and impeachment evidence at trial.

92. Absent Defendants' misconduct, the prosecution of Plaintiff could not and would not have been pursued, and Plaintiff would not have been convicted.

93. The Defendants' misconduct directly and proximately resulted in the unjust and wrongful criminal conviction of Plaintiff and his continuing wrongful imprisonment, thereby denying him his constitutional right to a fair trial, in

violation of the Due Process Clause of the United States Constitution.

94.   As a direct and proximate result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but not limited to loss of liberty, physical sickness and injury, and emotional distress.

95.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

### COUNT II – 42 U.S.C. § 1983
### Failure to Intervene

96.   Each paragraph of this Complaint is incorporated as if restated fully herein.

97.   In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

98.   As a direct and proximate result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including but not limited to loss of liberty, physical sickness and

injury, and emotional distress. These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

99.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

**COUNT III – 42 U.S.C. § 1983**
**Detention without Probable Cause**

100. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

101. Defendants caused Plaintiff to be unreasonably seized and further caused Plaintiff to be improperly subjected without probable cause. This detention resulted in injury.

102. Defendants accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence to institute and continue Plaintiff's detention.

103. Statements of the Defendants regarding Plaintiff's alleged culpability were made with knowledge that said statements were false and perjured. In so doing, the Defendant Officers fabricated evidence, withheld exculpatory information, and destroyed and/or lost material and exculpatory evidence.

104. The misconduct in this Count violated Plaintiff's rights under the Fourth Amendment and *Manuel v. Joliet*.

105. The misconduct described in this Court was undertaken with malice, willfulness, and reckless indifference.

106. The misconduct described in this Count was undertaken pursuant to the City's policy and practice in the manner more fully described above.

107. As a result of this misconduct, Plaintiff sustained, and continues to sustain, injuries including physical injury and sickness, and emotional pain and suffering.

### COUNT IV – 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

108. Each paragraph of this Complaint is incorporated as if restated fully herein.

109. After the shooting at issue in this case, Defendants, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff of his constitutional rights, including his rights to due process and to a fair trial, all as described in the various paragraphs of this Complaint.

110. Additionally, before and after Plaintiff's conviction, the Defendants further conspired to deprive Plaintiff of exculpatory information to which he was lawfully entitled and

which would have led either to his not being charged, his acquittal, or his more timely exoneration.

111. In this manner, the Defendants, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

112. In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above – such as fabricating evidence, withholding exculpatory evidence, coercing false statements, and committing perjury during hearings and trials – and was an otherwise willful participant in joint activity.

113. As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Plaintiff's rights were violated, and he suffered injuries, including but not limited to loss of liberty, physical sickness, and emotional distress.

114. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's rights.

## COUNT V – 42 U.S.C. § 1983
### Municipal Liability

115. Each paragraph of this Complaint is incorporated as if restated fully herein.

116. The actions of all the individual Defendant Officers were undertaken pursuant to policies and practices of the Department, described above, which were ratified by policymakers for the City of Chicago with final policymaking authority. These policies and practices included but were not limited to the failure to adequately train, supervise, and discipline officers who engaged in the alleged constitutional violations, as set forth in greater detail above.

117. The policies and practices described in this Count were maintained and implemented by the City of Chicago with deliberate indifference to Plaintiff's constitutional rights.

118. As a direct and proximate result of the City's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

119. The City of Chicago is therefore liable for the misconduct committed by the Defendant Officers.

## COUNT VI – State Law Claim
## Malicious Prosecution

120. Each paragraph of this Complaint is incorporated as if restated fully herein.

121. Defendants accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of

exerting influence and to institute and continue the judicial proceedings.

122. Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

123. Statements of the Defendants regarding Plaintiff's alleged culpability were made with knowledge that said statements were false and perjured. The Defendant Officers also fabricated evidence, coerced false inculpatory statements from Plaintiff's co-defendant and witnesses, withheld exculpatory evidence that would have demonstrated Plaintiff's absolute innocence, and destroyed material and/or exculpatory evidence. The Defendants were aware that, as described more fully above, no true or reliable evidence implicated Plaintiff in the shooting at issue in this case.

124. Defendants intentionally withheld from and misrepresented to prosecutors facts that further vitiated probable cause against Plaintiff, as set forth above, and failed to investigate evidence which would have led to the actual perpetrator. Defendants withheld the facts of their manipulation and the resulting fabrications from Plaintiff.

125. The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

126. On November 6, 2017, the prosecution terminated in Plaintiff's favor when his conviction was vacated and all charges against him were dismissed.

127. As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, injuries as set forth above, including physical sickness and injury, and emotional distress.

## COUNT VII – State Law Claim
### Intentional Infliction of Emotional Distress

128. Each paragraph of this Complaint is incorporated as if restated fully herein.

129. The acts and conduct of the Defendants as set forth above were extreme and outrageous. Defendants' actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

130. As a direct and proximate result of the Defendants' actions, Plaintiff suffered and continues to suffer physical sickness and severe emotional distress.

## COUNT VIII – State Law Claim
### Civil Conspiracy

131. Each paragraph of this Complaint is incorporated as if restated fully herein.

132. As described more fully in the preceding paragraphs, the Defendants, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

133. In furtherance of the conspiracy, the Defendants committed overt acts and were otherwise willful participants in joint activity including, but not limited to, the malicious prosecution of Plaintiff and the intentional infliction of emotional distress upon him.

134. The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

135. As a direct and proximate result of the Defendants' conspiracy, Plaintiff suffered damages, including physical sickness and severe emotional distress, as is more fully alleged above.

## COUNT IX – State Law Claim
## Respondeat Superior

136. Each paragraph of this Complaint is incorporated as if restated fully herein.

137. In committing the acts alleged in the preceding paragraphs, each of the Defendant Officers were members of, and

agents of, the DEPARTMENT, acting at all relevant times within the scope of their employment and under color of law.

138. Defendant City of Chicago is liable as principals for all torts committed by its agents.

139. In committing the acts alleged in the preceding paragraphs, Defendant Jefferson was a member of, and agent of, the Cook County State's Attorney's Office, acting at all relevant times within the scope of her employment and under color of law.

140. Defendant Cook County is liable as principal for all torts committed by its agents.

**COUNT X – State Law Claim
Indemnification**

141. Each paragraph of this Complaint is incorporated as if restated fully herein.

142. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

143. The Defendant Officers are or were employees of the Chicago Police Department, who acted within the scope of their employment in committing the misconduct described herein.

144. Defendant Cook County was at all times material to this complaint the employer of Defendant Jefferson, and is

38

therefore responsible for any judgment entered against Defendant Jefferson and for any judgment entered against her during said employment with the County, making the County a necessary party to this complaint.

WHEREFORE, Plaintiff, KEHINDA MITCHELL, respectfully requests that this Court enter judgment in his favor and against Defendants Chicago Police Detectives MICHAEL MCDERMOTT, JACK WILKINS, ANDY JONES, K. GLYNN, and JACK WILKINS, Youth Officer NAPOLEON STEVENSON, and Officer K. GROSS, Cook County Assistant State's Attorney SHARON JEFFERSON, THE CITY OF CHICAGO, COOK COUNTY, ILLINOIS, and Unknown Current or Employees of the City Of Chicago, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

/s/  Danielle Hamilton


Jon Loevy
Tara Thompson
Gayle Horn
Danielle Hamilton
LOEVY & LOEVY

311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
P: (312) 243-5900
F: (312) 243-5902